# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

| | | |
|---|---|---|
| **KENNETH CARPENTER,** | : | **Case No. 1:04 cv 1689** |
| | : | |
| **Plaintiff,** | : | **JUDGE KATHLEEN O'MALLEY** |
| | : | |
| **v.** | : | |
| | : | |
| **KAISER PERMANENTE,** | : | <u>**ORDER**</u> |
| | : | |
| **Defendant.** | : | |
| | : | |

This case involves claims of interference with rights alleged to be protected under the Federal Medical Leave Act ("FMLA"), and retaliation claimed to be the result of invoking FMLA leave and reporting gender discrimination.

Plaintiff Kenneth Carpenter ("Carpenter") originally filed an eleven-count Complaint against his former employer, Defendant Kaiser Foundation Health Plan of Ohio, Inc. ("Kaiser"). The action was pending in the Cuyahoga County Court of Common Pleas before being removed to this Court by Kaiser. As a result of prior Orders issued by this Court, Carpenter's FMLA claim (Sixth Claim For Relief), and his retaliation claims (Ninth Claim For Relief), are the only claims remaining in the Amended Complaint. These claims relate to Carpenter's discharge from employment with Kaiser in February, 2004.

Pending before the Court is Kaiser's Motion for Summary Judgment (Doc. No. 35). For the reasons set forth below, Kaiser's Motion is <u>**GRANTED**</u>.

## I.      BACKGROUND

The following facts are not in dispute, except where noted.  Carpenter began his employment with Kaiser in April, 1998.  In January, 2003, he was transferred to Kaiser's Member Services Center ("the call center") to work with the specialty queue team.  Kathy Fekete was Manager of the call center at the time, and Sarah King was a Clinical Coordinator and Carpenter's immediate supervisor.

The specialty queue team at Kaiser's call center is made up of registered nurses and member service representatives who handle telephone triage calls for the various specialty medical departments. Patients describe their complaints over the telephone, and the person handling the call evaluates those complaints and schedules appointments with physicians.  Nurses also offer suggestions that might help the patients.

Upon being transferred to the call center, Carpenter became lead nurse for the specialty queue team.  Monthly performance reports, activity reports, and call observation feedback reports detail his call handling performance during the time period between February 2003 and December 2003.  Many of the reports contain handwritten notations thanking Carpenter for his "commitment to member services," and encouraging him to "keep up the great job." *Plaintiff's Response Opposing Defendant's Motion for Summary Judgment, Exhibit A*.  Carpenter was also generally identified as performing at "target" during this time period.  *Id.*

Carpenter's employment at the call center was not without problems, however.  During his approximately twelve months of service at the center, Carpenter received two Performance Notifications and one Corrective Action notice.  These notifications were based primarily upon

2

performance tracking by the center's software program that revealed various discrepancies.[1]

The first performance issue occurred in June, 2003.  Carpenter was placed on a Level I Employee Performance Notification as a result of not meeting the availability standard for the call center during the month of May, 2003.  Nurses at the center are required to be available for patient calls 96% of the time they are logged on the system.  Tracking by the system's software revealed that Carpenter's availability for May had only been 92%.  The performance notification presented to Carpenter stated: "This is an initial discussion and is fact finding and gathering and is not disciplinary in nature." *Plaintiff's Deposition, Exhibit 5*.  A follow-up memo, however, advised Carpenter that his "current availability does not meet standards of performance." *Plaintiff's Deposition*, *Exhibit 6*.

Carpenter was also informed as part of the June performance notification that the tracking revealed he had been signing off the system before the end of his shift, thereby making him unavailable for patient calls.  Carpenter was warned that signing off early is considered a "tardy" by Kaiser, and it was recommended that Carpenter refer to the leader board to ensure his time was accurate.  *Plaintiff's Deposition, Exhibit 5*.

Carpenter does not dispute he was placed on a performance notification in June, 2003.  In fact, the record shows he agreed to and signed the notification without comment.  Carpenter does, however, dispute that he was making himself "unavailable" before the end of his shift.  He claims in an Affidavit attached to his Brief in Opposition that the software was only capturing the calls coming *in* from

---

[1]     Employees at the call center are informed that management has the ability to randomly monitor calls.  They are also made aware of the fact that a software application captures the telephone use for each nurse - showing whether the nurse is "available," handling a "live call," or in "wrap."  Wrap is the period of time after a call ends during which the person handling the call can document it.

patients, and was not accounting for the calls that Carpenter generated *out* to patients.[2]  Regardless, Carpenter's call availability improved after this initial performance notification.

The second performance issue occurred in August, 2003, when Carpenter was placed on a Level II Employee Performance Notification.  This time, the notification advised Carpenter that, on August 21, 2003, the software had captured Carpenter checking voice messages in the electronic message box while there were several "live calls" from patients waiting in the specialty queue.  Carpenter was approached by a care desk coordinator who asked Carpenter to take the incoming calls.  Carpenter did not do so, however, on his belief that the four messages he was checking in the electronic message box took precedence over the seven incoming calls waiting in the specialty queue.  *Plaintiff's Deposition, pp. 84-85*.

While Carpenter continued to check voice messages, the care desk coordinator contacted Carpenter's supervisor - Sarah King.  Ms. King approached Carpenter as he was leaving a voice message for a patient.  After Carpenter concluded the call, Ms. King requested that he switch over to take the inbound calls because there were six live calls remaining to be handled.  Carpenter again voiced his belief that the calls in the message box were more urgent than - and took precedence over - the live calls waiting in the queue.[3]  After being informed by Ms. King that he needed to take the live calls, Carpenter responded by stating - in the presence of other members of the team - "What we need is to hire more people." *Plaintiff's Deposition, pp. 86-87; Plaintiff's Deposition, Exhibit 7*.  Carpenter

---

[2]      There is no documentary evidence in the record of any software "glitch."

[3]      Carpenter concedes in his deposition that there is no way of knowing the urgency of live calls until someone actually handles the call.  *Plaintiff's Deposition, pp. 84-85*.

4

did not switch over to the live calls until three minutes later.  *Plaintiff's Deposition, Exhibit 7;*
*Plaintiff's Affidavit, ¶25.*

Also mentioned in the August, 2003 notification were separate issues relating to Carpenter's
"wrap" status.  Carpenter was informed that he had been observed throughout the day on August 21,
2003 remaining in wrap status and talking to other employees after he had finished documenting a call
(rather than handling the calls that were waiting in the queue).  It was also observed that Carpenter was
remaining on "hold" at the end of a call to have conversations with other employees.  *Plaintiff's*
*Deposition, p. 88; Plaintiff's Deposition, Exhibit 7.*  Finally, it was documented in the performance
notification that: (1) Carpenter was apprised in the past of the effects that extended wrap has on the
organization as a whole; (2) implied insubordinate behavior (repeatedly challenging a coordinator
request) is disrespectful; (3) public negative statements about the organization create an unhealthy work
environment for fellow staff and undermine Kaiser work practices; and (4) using extended wrap or
using the hold control to have conversations with staff is inappropriate ... [c]onversations of a personal
nature should not be done on work time ... [i]t has been mentioned to Ken previously to redirect
conversations or calls of this nature to a coordinator.  *Plaintiff's Deposition, Exhibit 7.*

Carpenter was warned in the Level II notification:

> There will be no further incidences of implied insubordination
> (challenging coordinator requests, public conversations of dissatisfaction
> about any work aspect).  The goal is to have respectful communication
> with others throughout employment.
> * * *
> There will be no further incidences of remaining in wrap or using hold
> to have conversations of an inappropriate content.
> * * *
> Random monitoring of telephone use will continue throughout
> employment as with any other employee.

*Plaintiff's Deposition, Exhibit 7.*

5

Again, Carpenter does not dispute he received a performance notification in August, 2003.  He claims in his Affidavit, however, that he did not "refuse" to change to inbound status.  By contrast, his deposition testimony confirms he did not immediately switch over to the live calls after being requested to do so, and that he took an additional three minutes to switch over after being requested a second time to do so.  *Plaintiff's Deposition, pp. 84-86; Plaintiff's Deposition, Exhibit 7*.  Whatever Carpenter's subjective belief, the record indicates he did not follow a direct instruction from his supervisor at the time it was given - doing so only after questioning the supervisor, and only after a period of further hesitation.

Following the second performance notification, Carpenter was assigned to another work area in the hopes of decreasing what the notification termed "frequent distractions."  Carpenter also agreed to move his chair away from the main area in order to "prevent many of my current distractions." *Plaintiff's Deposition, p. 88*.  Lastly, to ensure his availability for live calls, responsibility for checking voice messages in the electronic message box was rotated among all the registered nurses on the specialty queue team.  Unfortunately, this did not end Carpenter's troubles.

On January 21, 2004, Carpenter was placed on a Level III Corrective Action notice after three members of management separately monitored a purported outbound call made by Carpenter that the software system detected as excessively long.  On each occasion, when the members of management monitored the call no sounds were heard to indicate it was a live call (e.g., there were no speaking voices, and there was no "hold" music).

When Ms. King approached Carpenter and asked him about his outbound call status, Carpenter stated he had been on the phone with Kaiser's ophthalmology center.  But management pulled the phone company records and they found no outbound call made by Carpenter that would account for the

6

six-and-a-half minutes of call time tracked by the software.  Carpenter was likewise unable to explain in his deposition why the telephone records showed that no number or digit was dialed at all.  The corrective notice stated "[t]his unacceptable practice prevents availability to members," and warned Carpenter "[t]here will be no further incidents of inappropriate use of company time during employment."  Carpenter was again informed that his calls would be randomly monitored.  *Plaintiff's Deposition, Exhibit 8*.

On January 30, 2004, Carpenter's calls were randomly monitored by management as previously warned.  According to the uncontested deposition of Ms. King, on at least one occasion Carpenter was improperly in wrap status while he was reading a newspaper.  *King Deposition, p. 28.*  On another occasion, Carpenter was on a call that was not related to member services.  The call turned out to be a discussion between Carpenter and another Kaiser employee wherein Carpenter was questioning the employee on the reasons why a male physician's assistant was continuing his employment with Kaiser, while a female physician's assistant was not.  *Plaintiff's Deposition, p. 104*.  Carpenter claims he was questioning this because the female physician assistant who was not staying had more seniority, and this information was relevant to his job duties.  He testified in deposition, however, that the only information he needed was which physician's assistants would be available for purposes of scheduling patient appointments.  *Id.*

Later that day, Ms. King called Carpenter to ask him what he was doing because the system was showing Carpenter in "wrap" status for over seven minutes while there were two live calls waiting in the queue.  Carpenter testified he had been tied up with an "awful amount of documentation" after finishing up with a patient message.  *Plaintiff's Deposition, p.* 99.  Carpenter, therefore, responded to Ms. King's call by stating: "Each message is what it is.  What would you like me to do?  I'm still

7

documenting." *Id.*  After Ms. King advised Carpenter that he needed to take the two live calls waiting in the queue, Carpenter again responded "Each call is it's own thing.  I'm still documenting."  *Id.* Carpenter then left his work station while the live calls waited in the queue.

Ms. King testified in her deposition that, after Carpenter left his work station, she approached Carpenter to ask why he did not take the calls.  But Carpenter walked into the restroom, stating he was taking a break.  *King Deposition, p. 12.*  Ms. King then met with her manager, Kathy Feteke, late in the afternoon that same day.  The purpose of the meeting was to discuss what Ms. King perceived to be another instance of insubordination, and Carpenter's continued misuse of company time.   Several options for disciplinary action were discussed, including termination.  It was not decided at that time, however, what level of discipline would be most appropriate in light of Carpenter's past performance issues.  *King Deposition, pp. 17-21.*  Ms. King did not meet with Carpenter after speaking with her manager.

According to the uncontested deposition testimony of Ms. King, she met with Kathy Feteke again on February 2, 2004 to further discuss disciplinary options with respect to Carpenter.  *King Deposition, p. 22.*  The parties are in agreement that February 2, 2004 was a previously agreed-upon, scheduled day off for Carpenter.  Ms. King further testified that the decision to terminate Carpenter was made at this meeting.  *Id.*

A document was created (purportedly on February 2, 2004) entitled "Performance Issues Documentation," which outlines the events precipitating Carpenter's termination and advises Carpenter he is being terminated.  The document was to be presented to Carpenter on his next scheduled work day

8

- February 3, 2004.[4]  On February 3, 2004, however, Carpenter left several voice messages stating he was sick and would be on leave through February 13, 2004.  *King Deposition, p. 11.*  Prior to this, no mention of any type of leave had been made or requested by Carpenter.  Ms. King also testified she was unaware that Carpenter was ever on FMLA leave.  *King Deposition, pp. 11, 31.*

On or about February 3, 2004, Human Resources sent Carpenter a packet of FMLA materials and documents, including a document entitled "Certification of Health Care Provider for Medical Leave of Absence."  The cover letter accompanying the FMLA materials stated:

> You must have the physician complete, sign and date the enclosed Certification of Health Care Provider form.  Please return this document to Human Resources no later than 15 days from the receipt of this letter.
> * * *
> It is the employee's responsibility to ensure the papers are received by the Human Resources Department.

*Plaintiff's Deposition, Exhibit 2.*  Additionally, a document sent to Carpenter entitled "Employee Request for Family or Medical Leave and Employer Response" contained the directive:

> You will be required to furnish medical certification of a serious health condition.  ***The leave will be granted as FMLA contingent on your providing medical certification <u>only if eligible for FMLA</u>.***  You must furnish certification by 2/18/04 (at least 15 days after you are notified of this requirement).  Failure to comply may cause your request to be delayed or denied.  Your absence may be considered under the Absence Monitoring Policy.

*Id.* (emphasis in original and added).  Despite these instructions, a completed copy of the Certification was never submitted by Carpenter to Kaiser's human resources department.  *Defendant's Motion for Summary Judgment, Appendix 2, Declaration of Linda Heidenhoffer.*  Carpenter admits he did not

---

[4]  The document was not signed or dated on the day it was created, which Ms. King testified was on February 2, 2004.  Rather, it was signed and dated on the day it was presented to Carpenter, which was on February 16, 2004.

9

present the medical certification to his physician until February 13 - approximately ten days after Kaiser sent the certification to him.  *Plaintiff's Affidavit*, ¶8.  Carpenter also concedes that he has never even seen a completed medical certification from his doctor.  After making a single inquiry, he stated he "didn't figure it mattered all that much" with everything that had occurred.  *Plaintiff's Deposition, pp. 62-63*.

On February 13, 2004 - the Friday before he was scheduled to return to work - Carpenter came to the office and  met with Mort Stein, Senior Human Resources Consultant.  Mr. Stein was not aware that Carpenter had taken FMLA leave.  *Stein Deposition, p.18*.  Carpenter presented Mr. Stein with a document authored by Carpenter, which alleged that Kaiser discriminated against male nurses.  This was the first time Carpenter ever mentioned any such concerns to Mr. Stein, or to anyone at Kaiser. *Plaintiff's Deposition, p. 122*.

Due to the sensitive nature of the allegations, Mr. Stein assured Carpenter that he would take every precaution to guard against communication of the allegations to management.  *Plaintiff's Deposition, p. 112*.  Carpenter likewise did not inform anyone he had spoken with Mr. Stein; specifically, he did not tell anyone he had made a complaint of gender discrimination.  *Plaintiff's Deposition, p. 136*.

Carpenter was paid FMLA-pay for the period of February 01, 2004 through February 14, 2004. *Plaintiff's Exhibit B in Support of Plaintiff's Response to Defendant's Motion for Summary Judgment*. Mr. Stein testified that it is not unusual to pay for requested leave, pending approval of a leave of absence.  Some supervisors at Kaiser will put "FMLA leave" into an employee's time-keeping system before the leave is actually approved, or before the employee is notified that the leave is approved, simply so that the employee can have income during their absence on the assumption that approval will

10

be obtained.  *Stein Deposition, p.24*.

On February 16, 2004, the day Carpenter returned to work, Ms. King and Kathy Feteke asked to speak with Carpenter before he entered the main work area.  Carpenter testified he believed the meeting related to his duty to supply a medical certification form to his supervisor, which was not "out of the way" yet.  *Plaintiff's Deposition, p. 108*.  Instead, Carpenter was presented with the Performance Issues Documentation in a private conference room, and was advised of his termination effective February 16, 2004.  *King Deposition, Exhibit 1.*

Carpenter filed suit against Kaiser on July 13, 2004, alleging his termination was unlawful.  He contends he performed his duties with "skill and proficiency" at all times, and yet, Kaiser wrongfully discharged him on February 16, 2004.  He seeks damages, including emotional distress, as a result of Kaiser's alleged interference with his FMLA rights, and as a result of being discharged in retaliation for invoking FMLA leave and reporting gender discrimination.

Kaiser responds by arguing Carpenter's discharge was solely the result of prior incidences of insubordination and misuse of company time.  Kaiser's Motion for Summary Judgment - at least as it relates to Carpenter's FMLA claim - is based upon Carpenter's failure to turn in a completed medical certification form.  Kaiser claims the lack of a completed medical certification, when requested by the employer, is fatal to an FMLA claim.

With respect to Plaintiff's retaliation claims, Kaiser argues the events precipitating the disciplinary action taken - including the ultimate decision to terminate Carpenter - all occurred *before* Carpenter requested leave, and *before* he complained of gender discrimination.  According to Kaiser, this dispels any alleged temporal connection between Carpenter's protected activities, if any, and Kaiser's disciplinary action and, therefore, Carpenter fails to make out a prima facie case of retaliation.

11

## II.     STANDARD OF REVIEW

Federal Rule of Civil Procedure 56(c) governs summary judgment motions and provides:

> The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law . . . .

Rule 56(e) specifies the materials properly submitted in connection with a motion for summary judgment:

> Supporting and opposing affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein . . . .  The court may permit affidavits to be supplemented or opposed by depositions, answers to interrogatories, or further affidavits.  When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denial of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial.  If the adverse party does not so respond, summary judgment, if appropriate, shall be entered against the adverse party.

The movant, however, is not required to file affidavits or other similar materials negating a claim on which its opponent bears the burden of proof, so long as the movant relies upon the absence of the essential element in the pleadings, depositions, answers to interrogatories, and admissions on file.  *See Celotex Corp. v. Catrett*, 477 U.S. 317 (1986).

In reviewing summary judgment motions, this Court must view the evidence in a light most favorable to the non-moving party to determine whether a genuine issue of material fact exists.  *See Adickes v. S.H. Kress & Co.*, 398 U.S. 144 (1970); *see also White v. Turfway Park Racing Ass'n, Inc.*, 909 F.2d 941, 943-44 (6th Cir. 1990).  A fact is "material" only if its resolution will affect the outcome of the lawsuit.  *See Anderson v. Liberty Lobby, Inc.*,  477 U.S. 242, 248 (1986).  Determination of

whether a factual issue is "genuine" requires consideration of the applicable evidentiary standards. Thus, in most civil cases the Court must decide "whether reasonable jurors could find by a preponderance of the evidence that the [non-moving party] is entitled to a verdict." *Id.* at 252.

Summary judgment is appropriate whenever the non-moving party fails to make a showing sufficient to establish the existence of an element essential to that party's case and on which that party will bear the burden of proof at trial. *Celotex*, 477 U.S. at 322. Moreover, "the trial court no longer has a duty to search the entire record to establish that it is bereft of a genuine issue of material fact." *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479-80 (6th Cir. 1989) (citing *Frito-Lay, Inc. v. Willoughby* (D.C. Cir. 1988), 863 F.2d 1029, 1034).

The non-moving party is under an affirmative duty to point out specific facts in the record as it has been established which create a genuine issue of material fact. *Fulson v. City of Columbus*, 801 F. Supp. 1, 4 (S.D. Ohio 1992). The lack of such a response by the nonmoving party may result in an automatic grant of summary judgement. *See Reeves v. Fox Television Network*, 983 F.Supp. 703, 709 (N.D. Ohio 1997). The non-movant must show more than a scintilla of evidence to overcome summary judgment; it is not enough for the non-moving party to show that there is some metaphysical doubt as to material facts. *Fulson*, 801 F. Supp. 1 at 4.

## III.  DISCUSSION

The issue presently before the Court is whether there are any issues of material fact presented by the record that require a trial for resolution. Upon reviewing the evidence in a light most favorable to Carpenter, the Court concludes there are not.

13

### 1.  Violation of The Family Medical Leave Act

Carpenter argues in his Complaint that he had a serious health condition requiring an extended recovery period, and that Kaiser did not provide the leave required by the FMLA.  Subject to Section 2613 of the Act,[5] an eligible employee is entitled to twelve weeks of unpaid leave during any twelve-month period for a serious health condition that makes the employee unable to perform his or her job responsibilities and functions.  *See* 29 U.S.C. § 2612(a)(1)(D); *see also Ragsdale v. Wolverine World Wide, Inc.*, 535 U.S. 81, 86 (2002).  A serious health condition under the FMLA is one: (1) where an employee had been an inpatient in a medical facility; or, (2) where the employee was receiving continuous treatment from a health care provider.  *Carmen v. Unison Behavioral Health Group, Inc.*, 295 F. Supp. 2d 809, 813 (N.D. Ohio 2003).

Carpenter does not argue in his Response to Kaiser's Motion that he was hospitalized for his medical condition, or even that he was receiving continuous treatment from a health care provider.  He simply contends he was absent from work for a period of ten days, under a doctor's direction, and that Kaiser discharged him in contravention of the FMLA.[6]

The FMLA prohibits an employer from interfering with, restraining, or denying an employee's

---

[5]   This limitation is critical here, as the statute itself subjects the entitlement to twelve weeks of unpaid leave to the requirements of other parts of the Act, including the medical certification issue that is at the heart of the parties' briefs. This issue will be addressed by the Court in greater detail below.

[6]   Carpenter alleges in his Complaint that, on or about February 2, 2004, he was diagnosed with depression, obsessive compulsive disorder, insomnia and acute weight loss.  While there is some question as to the nature and extent of any health condition suffered by Carpenter, and whether his condition was sufficiently "severe" to qualify as a serious health condition preventing Carpenter from performing the essential functions of his job under the FMLA, the Court does not reach these questions because Kaiser has not raised them in its Motion.

14

exercise of the employee's rights under the FMLA.  *See* 29 U.S.C. § 2612(a)(1)(D).  If an employer interferes with the employee's right to the leave, the deprivation of the right is a violation of the FMLA regardless of the employer's intent.  *See Smith v. Diffee Ford-Lincoln-Mercury*, 298 F.3d 955, 960 (10th Cir. 2002), *citing King v. Preferred Tech. Group*, 166 F.3d 887, 891 (7th Cir. 1999).  There are two types of claims that can arise from a deprivation of FMLA rights: interference and retaliation.  *See Carmen*, 295 F. Supp. 2d at 813; *see also Bickley v. FMC Technologies*, 2003 U.S. Dist. LEXIS 9489 at *16 (N.D. Ohio 2003).  While a claim of retaliation is not expressly provided for on the face of the statute:

> [I]nherent within the exercise of the right to leave under the FMLA is that an employer cannot later use that leave against the employee.  By doing so, the employer interferes with the ongoing protections that accompany the right - protections that are part *prescriptive* in that the employer must afford the employee the right to be free from retaliation, as well as part *proscriptive* in that an employer cannot penalize an employee for invoking this or other FMLA rights.

*Welty v. Honda of America Mfg., Inc.*, 411 F. Supp. 2d 824, 829 (S.D. Ohio 2005)(emphasis in original).[7]

In the Sixth Claim For Relief of Carpenter's Amended Complaint, it is asserted:

> 30.    Defendant retaliated against Plaintiff by terminating his

---

[7]    This is in line with other federal courts that have identified two types of claims under the FMLA: (1) those that are prescriptive in nature, and relate to a denial of leave (also referred to as the "entitlement" or "interference" theory, which establishes entitlements to employees and sets a floor for employer conduct); and, (2) those which are proscriptive in nature, and relate to an adverse employment action alleged to be the result of requesting FMLA leave (the "retaliation" or "discrimination" theory, which prohibits disparate employer conduct with regard to employees taking leave).  *See Walker v. Elmer County Bd. of Ed.*, 379 F.3d 1249 (11th Cir. 2004); *see also Sosby v. Miller Brewing Co.*, 415 F. Supp. 2d 809 (S.D. Ohio 2005)(citing *Hoge v. Honda of America Mfg., Inc.*, 384 F.3d 238 (6th Cir. 2004)).

employment on February 16, 2004, the same day he returned from his leave.

31.     Defendant's wrongful termination and failure to restore Plaintiff to an equivalent position upon return from leave is a violation of the FMLA.

The Ninth Claim for Relief of Carpenter's Amended Complaint states:

37.     ... Defendant discharged Plaintiff in retaliation for ... taking FMLA leave.

*Plaintiff's Amended Complaint, pp. 6-7.*

Viewing the evidence in a light most favorable to Carpenter, it appears Carpenter is claiming that Kaiser failed to fulfill its obligations under the FMLA by preventing Carpenter from taking leave for his illness with the assurance that he could return to his job without the threat - or actuality - of being discharged.  The Court is, therefore, satisfied that Carpenter is asserting claims for interference *and* retaliation under the FMLA, and both will be addressed in this Opinion.

### a.  Interference With FMLA Rights (Sixth Claim for Relief)

In order for an employee to prevail on an interference claim under the FMLA, the employee must establish the following: (1) the plaintiff is an eligible employee; (2) the defendant is an employer; (3) the employee was entitled to leave under the FMLA; (4) the employee gave the employer notice of [his] intention to take leave; and, (5) the employer denied the employee FMLA benefits to which the employee was entitled.  *Cavin v. Honda of Am. Mfg.*, 346 F.3d 713, 719 (6th Cir. 2003).

Carpenter argues there is no question he availed himself of protected rights under the FMLA because Kaiser sent him FMLA materials, and because he received "FMLA" pay.  Both parties agree Carpenter called to request a leave of absence on February 3, 2004.  Kaiser also does not dispute it sent Carpenter FMLA materials on or about that same day.  In fact, attached as Exhibit C to Carpenter's

16

Response is a document showing that Carpenter was under the supervision of a doctor at the time he requested leave.  The document identifies Carpenter's work status as "ill and unable to work from 2/03/04 to 2/13/04."  Attached to Carpenter's Response as Exhibit B is a copy of Carpenter's pay stub, which reflects he was paid an "FMLA rate" during his leave.

In rebuttal, Kaiser disputes Carpenter's characterization of his absence.  Kaiser claims Carpenter was granted FMLA leave, and paid the FMLA rate for the ten days he was absent, conditioned upon his returning a signed medical authorization from his doctor.  It is Kaiser's position that Carpenter cannot establish a claim for interference with FMLA rights because Carpenter's leave was not FMLA-qualifying in the first instance.  Kaiser points to Carpenter's failure to ensure that Kaiser received a signed medical certification from Carpenter's doctor as support for its argument that Carpenter was not qualified for FMLA leave.  Kaiser further argues that the FMLA was not intended to insulate an employee from the consequences of his or her own poor performance.  Kaiser points to Carpenter's progressive discipline as evidence that Carpenter was terminated for reasons unrelated to the exercise of any rights under the FMLA.

Upon reviewing the record, the Court believes the question of whether there is a genuine issue of material fact regarding an interference with protected FMLA rights ultimately turns on an inquiry into whether the employee's failure to submit a signed medical certification to his employer - as requested by the employer - is fatal to an FMLA claim.  Because the Court answers this question in the affirmative, the Court finds that there is no genuine issue of material fact for trial on Carpenter's FMLA interference claim.

An employer has within its discretion the right to decide whether it will require a medical certification before granting an employee leave under the FMLA.  Medical certification is directly

17

addressed by the FMLA:

> (a) In general. An employer may require that a request for leave under subparagraph (C) or (D) of section 2612(a)(1) of this title be supported by a certification issued by the health care provider of the eligible employee ... The employee shall provide, in a timely manner, a copy of such certification to the employer.

*See* 29 U.S.C.A. § 2613(a).

The Code of Federal Regulations clarifies the employer's authority to require a medical certification from its employees. It also details the employer's duties to the employee, and the employee's responsibilities to the employer. For example, 29 C.F.R. § 825.305 provides in relevant part:

> (a) An employer may require that an employee's leave ... be supported by a certification issued by the health care provider of the employee ... An employer must give notice of a requirement for a medical certification each time a certification is required ...
>
> * * *
>
> (b) When the leave is foreseeable and at least 30 days notice has been provided, the employee should provide the medical certification before the leave begins. When this is not possible, the employee must provide the requested certification to the employer within the time frame requested by the employer (which must allow at least 15 calendar days after the employer's request), unless it is not practicable under the particular circumstances to do so ...
>
> * * *
>
> (d) At the time the employer requests certification, the employer must also advise an employee of the anticipated consequences of an employee's failure to provide adequate certification ...

*See* 29 C.F.R. § 825.305(a)-(e). The consequences of an employee's failure to produce a medical certification after being notified of the need to do so are explained by 29 C.F.R. § 825.311:

> (b) ... If the employee never produces the certification, the leave is not

18

FMLA leave.

*See* 29 C.F.R. § 825.311(a)-(c); *see also* 29 C.F.R. § 825.312(b).  Finally, an employee is warned that:

> (a)     An employee has no greater right to reinstatement or to other benefits and conditions of employment than if the employee had been continuously employed during the FMLA leave period.  An employer must be able to show that an employee would not otherwise have been employed at the time reinstatement is requested in order to deny restoration to employment.

*See* 29 C.F.R. § 825.216(a)-(d); *see also* 29 C.F.R. § 825.312(d).

Carpenter argues that submission of a medical certification is an "option" to the employer and, therefore, is not <u>required</u> of Carpenter before he may receive benefits under the FMLA.  In support of this, Plaintiff directs the Court's attention to a case from the District of Columbia.  In *Pendarvis v. Xerox Corp.*, 3 F. Supp. 2d 53 (D. D.C. 1998), the court held that medical certification was an option and not a requirement.  But the context of that case is not as Carpenter describes it.

The *Pendarvis* court indeed explained that medical certification was not required of the employee as a prerequisite either to receiving leave, or to maintaining an action for FMLA violations.  This explanation was based, however, upon the language in 29 C.F.R. § 825.305 that an employer "may" require a medical certification.  *Id.* at 56.  That court did not reach the question of what happens when the employer exercises that option because - unlike here - the employer in *Pendarvis* <u>never requested</u> a medical certification from the employee.  *Id.* ("Absent such a request, plaintiff was under no obligation to seek out medical treatment.").

Further, as Kaiser points out, *Pendarvis* is distinguishable from the standpoint of the plaintiff's medical complaints.  *Pendarvis* involved a pregnancy-related medical condition (morning sickness) and

the court concluded that, when read as a whole, the FMLA and the regulations implementing that Act "do not require medical evidence in cases of pregnancy-related morning sickness ... [t]hroughout the FMLA regulations, pregnancy is recognized as a special case that is treated differently from other serious health conditions." *Id.* at 55.  Even in that context, however, the court articulated:

> An employer is not without recourse if it believes that an employee is abusing the leave provisions of the FMLA.  Under the FMLA, an employer has the right to ask for a medical certification of plaintiff's condition before granting or denying her leave.  The certification provision is "designed as a check against employee abuse of leave," and if any employer requests such certification, "the certification must state that the employee is unable to perform the functions of the employee's position."

*Id.* At 56.  *Pendarvis*, therefore, is actually supportive of *Kaiser's* position - not Carpenter's.

While it is true that submission of a medical certification as a prerequisite to a grant of FMLA leave is an "option" rather than a "requirement," it is an option which belongs to the *employer*.  Once the employer exercises that option, the request for medical certification becomes a requirement with which the employee must comply - the only limitation being that the employer must give written notice to the employee of the employer's intent to require a medical certification and of the consequences for failure to do so.  *See* 29 C.F.R. § 825.305(a)-(e).

Here, Kaiser required that Carpenter provide medical certification before Carpenter could qualify for leave under FMLA.  Carpenter was informed that "it is the employee's responsibility to ensure the [medical certification] papers are received by the Human Resources Department." *Plaintiff's Deposition, Exhibit 2*.  Kaiser expressly warned Carpenter that failure to comply could cause his request to be denied.  *Id*.  Finally, Carpenter was made aware that his leave "will be granted as FMLA contingent on your providing medical certification only if eligible for FMLA." *Id.*

20

Because the applicable regulations make it clear that it was within Kaiser's discretion to require a medical certification, and Kaiser did, indeed, require the certification, advise Carpenter of the requirement, and warn of the potential consequences for failure to produce the certification, Carpenter's claim that submission of the certification was optional is unfounded.  An employee simply is not eligible for leave under the FMLA if he does not submit the proper FMLA medical certification to his employer as requested.  *See* 29 C.F.R. § 825.311(b) and 29 C.F.R. § 825.312(b)("If the employee never produces the certification, the leave is not FMLA leave.").[8]

Neither party disputes that Carpenter failed to adhere to Kaiser's requirements.  As such, Carpenter's absences from work cannot be considered as qualified leave under the FMLA.  Having established that medical certification may be required by an employer and that, if such certification is required, failure to provide the certification makes the employee ineligible for leave under FMLA, the Court next turns to the question of whether Carpenter can have a claim for FMLA interference if he was not eligible for FMLA leave in the first instance.

This Court has held that failure to satisfy the certification requirements for leave under FMLA is fatal to a claim of FMLA interference.  *See Gulan v. Fed. Reserve Bank of Cleveland*, 2003 WL

---

[8]   *See also Robertson v. Amtrak/National R.R. Passenger Corp.*, 400 F. Supp. 2d 612 (S.D. N.Y. 2005)(Employer's termination of employee for insubordination and excessive absenteeism did not violate the FMLA, even if employee took leave to undergo extensive treatment for bipolar disorder, alcohol dependence, and cocaine dependence, where employee did not comply with employer's request for medical documentation until four months after he stopped working); *Allender v. Raytheon Aircraft Co.*, 339 F. Supp. 2d 1196 (D. Kan. 2004)(Former employee failed to establish that she was entitled to leave under the FMLA, or that she was denied her substantive rights under the FMLA, as required for employee's claim that employer's conduct of terminating her for unsatisfactory attendance violated employee's rights under the FMLA, where the employee failed to provide employer with physician certification of her medical condition).

21

22047802 (N.D. Ohio Aug. 27, 2003); *see also Harrington v. Boysvill of Michigan, Inc.*, 145 F.3d 1331 (6th Cir. 1998)(holding that a terminated employee who failed to provide the required medical certification for FMLA leave had no claim against her employer for violation of FMLA where the employee had previously been told that certification was required in order to remain absent from work).

In *Gulan*, *supra*, the plaintiff sued her employer for violation of the FMLA. The plaintiff had been on probation for excessive absences when she was involved in an automobile accident and, as a result, missed several days of work. She requested leave under the FMLA, and was notified by her employer that her leave would be designated as FMLA on the condition that medical certification be produced. Fulfilling its duties under 29 C.F.R. § 825.305(a), the employer informed her: "If you ... fail to present the required medical certification, your leave may be denied ..." *Gulan,* 2003 WL 22047802, at *5. Like Carpenter in this case, the plaintiff in *Gulan* testified in deposition that she gave the certification to her doctor but failed to follow-up to determine whether the employer actually received the document back from her doctor. She was terminated for unauthorized absences. *Id.*

Judge Solomon Oliver of this court noted: "Inasmuch as [the plaintiff] provided no medical certification for her absence ... it cannot count as FMLA leave." *Id*. at *6. Because the leave could not count as FMLA leave, Judge Oliver found that the plaintiff could not successfully pursue a claim under the FMLA - including FMLA interference. *Id.* Summary judgment was granted to the employer since the termination, as a matter of law, did not constitute a violation of the FMLA.

Here, exactly as in *Gulan*, Carpenter has failed to show that he was qualified for FMLA leave. He has not even taken the necessary steps to ensure that he complied with his responsibilities with respect to qualifying for FMLA leave. His absences, therefore, were not protected - nor was reinstatement required. As Kaiser points out, "[a]n employee requesting FMLA leave, however, has

22

no greater protection against termination for reasons unrelated to the employee's FMLA leave than he would if he had not requested FMLA leave." *Washington v. Bosch Braking Systems, Corp.*, 1999 U.S. Dist. LEXIS 21361, at *4-5 (Nov. 24, 1999 W.D. Mich.); *see also* 29 C.F.R. § 825.216(a)-(d) and 29 C.F.R. § 825.312(d).  Kaiser, therefore, acted within its rights in terminating Carpenter for what the record reflects as a history of frictions and problems unrelated to any FMLA absences.

*Gulan* also addresses another issue raised - somewhat unclearly - by the parties.  Carpenter implies in his Opposition that, because he received "FMLA pay" during his absence, he must have been considered by Kaiser to be qualified for FMLA leave.  Carpenter appears to argue that Kaiser is somehow estopped from disputing his right to FMLA leave by virtue of these payments.  Kaiser argues, however, that any payments Carpenter received under the "FMLA rate" were conditional payments (conditioned on receipt of a completed medical certification) and that, having failed to satisfy the condition for the payments, Carpenter was not qualified for any pay - or leave - in the first instance. Thus, Kaiser contends that the payments to Carpenter simply are not meaningful to its right to dispute Carpenter's leave status.[9]

An employer is permitted to conditionally grant - and pay - an employee FMLA leave with the understanding that a final determination of FMLA leave will not occur until the employee can show a valid medical certification.  Although not specifically addressed by the FMLA, companies routinely grant FMLA leave to employees who need to take unforeseen leave *conditioned upon* the premise that the employee will show a valid medical certification within a reasonable time.  This is in line with the

---

[9]     In this regard, see *Rocha v. Sauder Woodworking Co.*, 221 F. Supp. 2d 818, 822 (N.D. Ohio 2002) where Chief Judge James Carr held that the plaintiff could not use the doctrine of promissory estoppel to establish entitlement to protection under the FMLA where she was otherwise ineligible for FMLA leave.

23

purpose of 29 C.F.R. § 825.311(b), which states, "When the need for leave is not foreseeable ... an employee must provide certification ... within the time frame requested by the employer (which must allow at least 15 days after the employer's request), or as soon as reasonably possible under the particular facts and circumstances."  The regulations themselves, therefore, envision a period of time in which the employee is placed on leave due to unforeseen circumstances until the employee can reasonably obtain a medical certification.

Again, this Court, in *Gulan*, found no issue with the employer preliminarily granting FMLA leave to the plaintiff before she produced medical certification (which, in the end, she failed to do). *Gulan*, 2003 WL 22047802, at *2.  Similarly, the District Court for the Southern District of Ohio has found it of no legal consequence that companies conditionally grant FMLA leave.  In *Zakharevskaia v. Online Computer Library Ctr.*, 2006 WL 1401666 (S.D. Ohio May 22, 2006), the plaintiff sued her employer for FMLA retaliation claiming she was terminated from her position because she had been absent from work under the FMLA.  *Id.* at *4.  The employer first conditionally granted the employee FMLA leave, and then officially granted her FMLA leave when it received her medical certifications. *Id.* at *2-3.  In its decision that there had been no FMLA retaliation (the employer's articulated reason for terminating the employee was documented as poor performance), the Southern District of Ohio never questioned the employer's right to conditionally grant FMLA leave.  *See also McCray v. H&R Block E. Enters., Inc.*, 2006 WL 1308181 (D. Mass. May 10, 2006)(illustrating that a company may conditionally grant FMLA leave with recognition that FMLA leave will not be officially granted until proper medical certification is provided, and, if never provided, that leave once conditionally granted may then be considered unprotected leave).

For all of these reasons, the Court grants Kaiser summary judgment on Carpenter's claims for

24

interference with FMLA rights (Sixth Count for Relief).

### b. Retaliation For Taking FMLA Leave (Sixth and Ninth Counts for Relief)

In reviewing retaliation claims, Ohio courts look to federal case law. *Filips v. Case Western Reserve University*, No. 79741, 2002 Ohio App. LEXIS 4576, at *7 (Ohio Ct. App. August 29, 2002). The material elements of a retaliation claim are: (1) the plaintiff engaged in a protected activity; (2) the defendant was aware the plaintiff exercised his civil rights; (3) the plaintiff experienced an adverse employment action; and, (4) a causal connection existed between the protected activity and the adverse employment action. *Nguyen v. City of Cleveland*, 229 F.3d 559, 563 (6th Cir. 2002).

In the context of his FMLA retaliation claim, Carpenter must show: (1) he availed himself of a protected right under the FMLA; (2) Kaiser knew of Carpenter's exercise of a protected right; (3) Carpenter was subjected to an adverse employment action; and, (4) there was a causal connection between the exercise of the protected right and the adverse employment action. *Canitia v. Yellow Freight Sys., Inc.*, 903 F.2d 1064, 1066 (6th Cir. 1990); *Arban v. West Publ'g Corp.*, 345 F.3d 390, 404 (6th Cir. 2003).

Carpenter can, of course, meet this burden of proof by demonstrating that Kaiser intentionally retaliated against him by discharging him solely because of his exercise of a protected FMLA right. *Spurlock v. Peterbilt Motors Co., Inc.*, 58 Fed. Appx. 630 (6th Cir. 2003). In the absence of direct evidence of Kaiser's intent to retaliate, however, Carpenter may use the burden-shifting framework employed in Title VII discrimination cases to establish his prima facie case of FMLA retaliation. *See Skrjanc v. Great Lakes Power Serv. Co.*, 272 F.3d 309, 315 (6th Cir. 2001).

The position taken by Kaiser with respect to Carpenter's FMLA retaliation claim is threefold.

First, Kaiser argues Carpenter cannot establish a prima facie case of FMLA retaliation for the same reasons he cannot establish an underlying FMLA claim. Kaiser, thus, claims Carpenter did not "avail himself of a protected right" because Carpenter was not *entitled* to FMLA leave in the first instance as a result of his failure to produce medical certification. Second, Kaiser claims Carpenter is unable to prove a prima facie case because the evidence does not support a causal connection between Carpenter's request for a medical leave of absence and Kaiser's decision to terminate him. Third, Kaiser points to what it classifies as legitimate business reasons for Carpenter's termination, and argues that Carpenter has failed to show that its reasons were designed to mask a retaliatory motive.

In response, Carpenter argues there is a close temporal proximity between his request for leave and his termination. He asserts that the "general rule" is that close temporal proximity is sufficient to establish a genuine issue of material fact of a causal connection, except in cases where there is unrebutted evidence that the decision maker did not have knowledge of the protected conduct. Carpenter claims that, because the evidence shows that Kaiser - as an *organization* - was aware that Carpenter was engaging in protected conduct by requesting FMLA leave, he has established a prima facie case of FMLA retaliation.

Carpenter has conceded in his Response Opposing Defendant's Motion for Summary Judgment that: "Defendant's alleged business reason for Plaintiff's discharge was related to work performance, not an unapproved absence from work." Carpenter, therefore, relies solely upon a proximity in time between his request for leave and his discharge as evidence of retaliation. Temporal proximity is a form of indirect evidence. *Skrjanc*, 272 F.3d at 315 (6th Cir. 2001). Because there is no direct evidence of retaliation on the basis of a medical leave anywhere in the record, the circumstantial evidence analysis of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973) applies. Kaiser has pointed to several

26

work performance concerns as the basis for its termination of Carpenter's employment; therefore, it is incumbent upon Carpenter to <u>convince</u> the trier of fact that Kaiser's articulated reasons for his termination are - in fact - pretextual.

Before beginning a *McDonnell Douglas* analysis, however, the Court must turn to a threshold question raised by Kaiser's initial argument; namely, whether Carpenter's claim for retaliation can survive in the first instance without an underlying protected activity. The parties have not provided any guidance on this issue. Kaiser asserts that Carpenter cannot maintain an FMLA retaliation claim without proof that his leave was qualified under the FMLA, but does not point to *any* legal authority supportive of its position. Carpenter wholly fails to argue - or provide support for - the alternative position that an employee can still maintain an action for FMLA retaliation even though the underlying activity or right is unprotected.

As previously discussed, the Court finds that Carpenter was not entitled to FMLA leave. His leave, therefore, cannot be considered FMLA-qualifying. *Gulan,* 2003 WL 22047802, at *6. In the context of an FMLA retaliation claim, Carpenter was not engaging in a protected activity or exercising a protected right when he took a ten-day medical absence. The Court is not convinced, however, after a comprehensive review of the FMLA and case law interpreting it, that simply because Carpenter's underlying FMLA interference claim is without merit mandates the conclusion that Kaiser cannot be liable for FMLA retaliation.

Not all retaliatory discharge claims fail at the summary judgment stage simply because the underlying claim of interference with a protected right is found to be without merit. For example, under Title VII it is clear that a retaliatory discharge claim can survive summary judgment even if the underlying claim of discrimination is not worthy of credence - at least from a substantive, rather than

27

a procedural, standpoint.[10]  Case law indicates that district courts in Ohio follow this general view. Thus, in *Burns v. Jacor Broadcasting Corp.*, 128 F. Supp. 2d 497 (S.D. Ohio 2001) - a case involving claims of gender discrimination and retaliation for complaining about disparate treatment of female employees - it was observed that:

> Plaintiff's success on her retaliation claim does not depend on the merits of the underlying discrimination claim. *See Powell v. Morris*, 37 F. Supp. 2d 1011, 1016 (S.D. Ohio 1999); *Spence v. Local 1250, UAW*, 595 F. Supp. 6, 10 (N.D. Ohio 1984)("An employee need not establish the validity of his original discrimination claim in order to prove a charge of employer retaliation flowing from the original claim ... the factual truth of the employee's accusation which inspired the reprisal is immaterial ... [w]hat is relevant is that the employee sincerely believed discriminatory practices existed ...").  "Thus, the employee need not establish that the alleged conduct she opposed was in fact discriminatory, so long as she can demonstrate that she had a good faith, reasonable belief that the conduct about which she complained was in violation of Title VII."  *Black v. Columbus Public Schools*, 124 F. Supp. 2d 550, 570-71 (S.D. Ohio 2000).

---

[10]    *See, e.g., Labonia v. Doran Associates, LLC*, 2004 WL 1921005 (D. Conn. Aug. 25, 2004)("The Second Circuit recognizes that "a plaintiff may state a *prima facie* claim for retaliation even when her primary claim for discrimination is insufficient to survive summary judgment"... However, in order to state such a claim, Ms. Labonia must have had a "'good faith, reasonable belief' that the underlying practice was unlawful.")(internal citations omitted); *Alvarez v. City of New York*, 31 F. Supp. 2d 334 (S.D.N.Y. 1998)("All too often, however, employers react negatively to the assertion of a claim and consequently turn a weak discrimination case into a strong retaliation case ... The fact that the "primary claim" is unsuccessful does not preclude a claim for retaliation, for "a finding of unlawful retaliation is not dependent on the merits of the underlying discrimination complaint.")(internal citations omitted); *Bolin v. Oklahoma Conf. of the United Methodist Church*, 397 F. Supp. 2d 1293 (N.D. OK 2005)("Although this Court has granted summary judgment as to the sexual harassment claims and, hence, there is no underlying unlawful employment practice, plaintiff's good faith belief that Title VII was violated is a sufficient predicate for a retaliation claim.")(internal citations omitted); *Burns v. Snow*, 130 Fed. Appx. 973 (10th Cir. 2005)("The employee may maintain an action for retaliation even though the conduct forming the basis of her underlying complaint was not adjudged to have violated Title VII.")(internal citations omitted).

*Burns*, 128 F. Supp. 2d at 514-15.

Of course, Title VII is different in terms of the protections afforded to the claimant. For instance, under the FMLA, a plaintiff must comply with certain procedures - and meet certain criteria - *before* the plaintiff is even entitled to the protections of that statute. In contrast, under Title VII a plaintiff is automatically afforded certain protections simply on the basis of his or her status as a member of a protected class. Additionally, Title VII only requires that an employer have fifteen employees on staff to be subject to that Act, whereas the FMLA requires that an employer have fifty employees on staff before the employer is required to provide a protected medical leave of absence (if other conditions are met). Finally, the cases brought under Title VII in which the plaintiff was allowed to go forward on a retaliation claim even in the absence of proof of an underlying discriminatory employment practice were those in which the plaintiff *opposed and complained about* an employment practice in the "good faith belief" that it was unlawful - which is not the situation presented here. Here, though Carpenter requested FMLA leave, he did not comply with the basic prerequisites for being granted such leave. Carpenter could not have believed in good faith that he would be entitled to leave in the absence of the medical certification requested from him.

It is true that there is substantial case law supportive of the general argument that an employee who is "ineligible" for FMLA leave does not engage in statutorily protected activity and, therefore, does

not have a basis for asserting an FMLA retaliation claim.[11]  The vast majority of these cases, however,

deal with the FMLA's *eligibility criteria* of twelve-months of employment and 1,250 hours of service

prior to the date of the requested leave.  The Sixth Circuit has addressed a related procedural issue:

whether an employee can maintain a retaliatory discharge claim under the FMLA where the employee

has no entitlement to FMLA rights because the employer employs less than fifty individuals.  *See*

*Humenny v. Genex Corp., Inc.*, 390 F.3d 901(6th Cir. 2004).  The plaintiff in that case conceded she

was ineligible for FMLA leave as a result of the small size of her employer's workforce, but maintained

she was demoted and eventually dismissed for "attempting" to assert rights which she, *in good faith*,

believed she was entitled to under the FMLA.  *Id.* at 904-05.  The plaintiff argued she should be able

to assert an FMLA retaliation claim in this situation.  The Sixth Circuit disagreed, holding:

---

[11]     *See, e.g., Walker v. Elmore County Bd. of Ed.*, 379 F.3d 1249 (11th Cir. 2004)
(The court of appeals rejected the district court's holding that the FMLA can
protect someone who mistakenly asks for FMLA leave, although they are
ineligible.  The court of appeals held that a request for maternity leave that did not
meet the FMLA's eligibility criteria - both at the time of the request and at the
time the leave was to start - did not constitute a "protected attempt" to obtain an
FMLA benefit.  The plaintiff's retaliation claim, therefore, failed in the first step
of the analysis because the employee did not attempt to exercise, or engage in, a
statutorily protected activity); *Williemssen v. The Conveyor Co.*, F. Supp. 2d 813
(N.D. Iowa 2005)(Because the plaintiff was not an "eligible employee" on the
date her leave commenced, she was not entitled to the protections of the FMLA
even though her leave extended beyond the end of the twelve-month eligibility
period.  Accordingly, the employer did not act contrary to the FMLA when it
terminated her employment based upon the taking of excessive leave because
none of the leave was covered by the FMLA); *Shafniski v. Bell Atlantic, Inc.*, 2002
WL 31513551 (E.D. Pa. Nov. 5, 2002)("A plaintiff who is an ineligible employee
under the FMLA [because the plaintiff did not meet the 1,250 working hours
requirement] would not be engaging in statutorily protected activity in pursuing
leave under that statute."); *Pennant v. Convergys Corp.*, 368 F. Supp. 2d 1307
(S.D. Fla. 2005)("[A]n employee who is ineligible for FMLA leave [because the
employee did not meet the 1,250 working hours requirement] does not have a
valid cause of action for retaliation under the FMLA.").

Appellant argues that the statute's use of the words "employee" and "individual" indicates that these retaliation provisions apply regardless of whether an employee is eligible for leave under the statute. However, a close reading of the statute reveals that the retaliation provisions prohibit employers from retaliating based on the exercise of a "right" under the statute. The regulations provide similar protection by prohibiting retaliation based on the exercise of "any rights provided by the Act." 29 C.F.R. § 825.220(a)(1). Because Appellant is not an eligible employee, Appellant has never exercised or attempted to exercise any "rights" provided to her by the FMLA.

\* \* \*

The Court finds that the FMLA's "eligible employee" requirement applies in all FMLA cases, including retaliation cases. Accordingly, Appellant has failed to state a [retaliation] claim under the statute.

*Id.* at 905-06.[12]

In the situations described above, however, the plaintiffs were attempting to extend the FMLA's reach where Congress had expressly limited the Act's coverage (so as to exclude short-term or part-time employees, and small employers). Such extensions would clearly be at odds with the plain language of the FMLA. Carpenter's case, unfortunately, does not neatly fit into the category of either a procedural or substantive failure of the underlying claim which may negate a retaliation claim. The Court simply has not found any case law addressing the merits of an FMLA retaliation claim where the

---

[12]     As to Title VII's threshold requirement of fifteen employees to be considered an "employer" subject to the requirements of that Act, there are some federal courts that believe if the employer does not employee 15 or more employees, the employer cannot be liable for discriminatory employment practices and cannot be liable for retaliation. *See, e.g., Parker v. Yuba Cty. Water Dist.*, 2006 WL 2644899 (E.D. Cal. Sept. 14, 2006); *Stone v. Indiana Postal & Federal Employees Credit Union*, 2005 WL 2347226 (N.D. Ind. Sept. 26, 2005). Other federal courts would still allow a retaliation claim under Title VII even where the employer has less than 15 employees, provided the employee "had a good faith, reasonable belief that he was opposing an employment practice made unlawful by Title VII." *See, e.g., McMenemy v. City of Rochester*, 241 F.3d 279 (2nd Cir. 2001).

31

employee's underlying right to FMLA leave was found lacking as the result of the employee's failure to meet certain conditions imposed by the employer - that are within the bounds of the FMLA - after the employee requested leave.  Nonetheless, the Southern District of Ohio has noted in the context of an FMLA retaliation claim:

> [T]he "eligible employee" requirement is not an absolute bar against individuals seeking to assert FMLA *rights* even if they do not currently qualify for FMLA *leave*.  For example, Courts have held that an employee qualifies as an "eligible employee" when they have requested leave before satisfying the hours requirement, the prospective leave will not commence until after that requirement has been satisfied, and the adverse employment action occurs before the 12-month date ... Such a holding recognizes that the policy underlying the Act governs its language so as to bar inane results.

*Welty v. Honda of America Mfg., Inc.*, 411 F. Supp. 2d 824, 827 (S.D. Ohio 2005)(emphasis in original).

Because Carpenter has not briefed the issue of whether he can maintain an action for FMLA retaliation in the absence of proof that he was "engaging in statutorily protected activity," and because Kaiser cites no authority to support the contrary position, the Court chooses not to resolve what is clearly a theoretical dispute in this case.[13]  The Court finds that summary judgment on Carpenter's

---

[13]    The Court notes, however, that this case is vastly different from the situation in which a plaintiff with a relatively unblemished performance record tells his employer he intends to take FMLA leave and is terminated before the employer even considers whether the employee is qualified for FMLA leave or takes the steps necessary to get FMLA paperwork to the employee.  In such a case, proof of consideration of the employee's request as part of the termination decision would be a strong indication of an improper retaliatory purpose.  Where, however, an employee with pre-existing performance issues makes a request for a medical leave of absence during the height of his performance issues and the employer has taken the steps necessary to determine FMLA eligibility, there will inevitably be consideration of the FMLA in making the termination decision.  A conservative employer will consider the statute in deciding whether it is within its legal rights

32

FMLA retaliation claim is warranted in any event because, as a matter of law, there is no evidence that Kaiser's actions were retaliatory.

First, Carpenter has failed to prove a crucial element of his prima facie case of FMLA retaliation; namely, that there is a causal connection between his request for a medical leave of absence and Kaiser's actions in dismissing him.  Carpenter points to the fact that his date of termination was classified as <u>effective</u> on February 16, 2004 - the date he returned from a medical leave of absence. Kaiser, however, has offered unrebutted evidence that the actual <u>decision</u> to terminate Carpenter was made well in advance of Carpenter's return to work.  Ms. King testified that she met with Ms. Fekete on January 30, 2004, and again on February 2, 2004, to discuss further disciplinary action against Carpenter for what she perceived to be continuing acts of insubordination.

The wheels, therefore, were clearly in motion as of January 30, 2004 for the potential termination of Carpenter's employment.  According to the record evidence, this determination was finalized on February 2, 2004.  Carpenter has not rebutted this evidence.  Indeed, rather than showing that the termination decision was, in fact, made at some later point in time, or offering evidence to prove that the meetings did not occur when Ms. King testified they occurred, Carpenter simply points to the fact that the paperwork confirming his termination - which he was required to sign - was dated on the day he returned from his leave of absence, and that his discharge was labeled as being "effective" as of that date.

Carpenter's evidence, at best, shows a *coincidence* in timing - not a meaningful close temporal proximity as Carpenter contends.  And, while Carpenter claims that the "general rule" is that close

---

to terminate the employee for performance issues, despite the employee's medical absence.

temporal proximity is sufficient to create a genuine issue of material fact on a causal connection in an FMLA retaliation case, federal courts within Ohio do not agree. Time and again it has been held in this Circuit that proximity in time is not, in and of itself, sufficient to establish a causal connection. *See Skrjanc v. Great Lakes Power Serv. Co.*, 272 F.3d 309, 317 (6th Cir. 2001); *Coulter v. Deloitte Consulting, L.L.C.*, 79 Fed. Appx. 864 (6th Cir. 2003); *Zakharevskaia v. Online Computer Library Ctr.*, 2006 WL 1401666 (S.D. Ohio May 22, 2006). Furthermore, "[e]vidence that the employer had been concerned about a problem before the employee engaged in the protected activity undercuts the significance of the temporal proximity." *Sosby v. Miller Brewing Co.*, 415 F. Supp. 2d 809, 822 (S.D. Ohio 2005).

Even if this Court was to erroneously hold that temporal proximity - standing alone - is sufficient to establish a genuine issue of material fact on whether there was a causal connection between Carpenter's request for leave and Kaiser's dismissal of him, Carpenter himself pointed out that there is an exception where the underlined decision makers did not have knowledge of the protected activity. The Court finds that the exception is the rule here. Carpenter has not produced a single shred of evidence that either Ms. King or Ms. Feteke were in any way involved in the FMLA process. Nothing in the record indicates that either of these two decision makers sent, received, reviewed, or processed Carpenter's FMLA request or paperwork. In fact, the testimony of Mort Stein unequivocally reveals that the person at Kaiser responsible for the approval or denial of FMLA leave is Linda Heidenhofer, and that all FMLA paperwork - including information from the doctor - goes through human resources. *Stein Deposition*, p. 23-24. Finally, Ms. King clearly testified she was not aware Carpenter had requested FMLA leave. *King Deposition, pp. 11, 31.* Carpenter has not produced any evidence to dispute this.

Finally, even if Carpenter established a causal connection sufficient to prove a prima facie case

34

of FMLA retaliation, he has not rebutted Kaiser's articulated, legitimate reasons for terminating Carpenter.  Although the FMLA prohibits employers from considering a request for medical leave as a negative factor in an employer's decision to discharge or demote an employee, it is not a shield to protect employees from legitimate disciplinary action by their employers if their performance is lacking in some manner unrelated to their FMLA leave.  *See* 29 C.F.R. § 825.216(a)-(d) and 29 C.F.R. § 825.312(d).

The record reflects a series of employment-related disagreements between Carpenter and Kaiser over the course of several months, which was worsening.  There is a documented pattern of progressive disciplinary action taken against Carpenter for work performance issues.  Whether the claims made in the disciplinary notices were "spurious," as Carpenter alleges, or legitimate, the fact remains there was friction between Carpenter and his supervisors for some time - which Carpenter acknowledges.

The Court is satisfied that Kaiser has sufficiently demonstrated it would have terminated Carpenter regardless of his request for leave.  Indeed, Kaiser had already begun to process Carpenter's termination at least one day prior to any notice of a medical problem.  Carpenter has shown nothing - in his Opposition or by way of documentary evidence - that Kaiser's articulated business reasons for

his discharge were a pretext for FMLA retaliation.[14]  The Court finds, therefore, that Kaiser is entitled

to judgment as a matter of law on Carpenter's claim of FMLA retaliation (Sixth and Ninth Counts for

Relief).

---

[14]    Carpenter points to a document dated April, 2002 entitled "Issue Resolution and
Corrective Action Participant's Guide," which appears to be authored by the
National Labor Management Partnership.  The document discusses five levels of
corrective action an employer can take against an employee, including a "day of
decision," before termination.  Because Kaiser allegedly did not give Carpenter a
"day of decision," Carpenter claims that Kaiser's reasons for terminating him
were pretext for discrimination.  Carpenter has not, however, linked this
document to Kaiser in any way.  For instance, he has not proven that Kaiser
participated in the creation of the document, that Kaiser uses it in the ordinary
course of its business, or that Kaiser provides every employee with a copy of this
document.  Indeed, Carpenter testified in his deposition that he had never seen this
document during his employment with Kaiser, that he was unaware of what the
National Labor Management Partnership was, and that he was given the document
by one of his "peers" at the call center.  *Plaintiff's Deposition*, p.  More
importantly, when asked in deposition what a "day of decision" was, Ms. King
testified it is an option the employer has - which includes offering the employee a
last chance to abide by the standards of the organization, or offering to accept a
resignation.  *King Deposition*, p. 18.  She further testified that Carpenter did not
qualify for this option due to his pattern of resisting tasks he was asked to do, his
inability to discuss work performance issues without hostility or blame, and a
continuing trend of misuse of company resources.  *King Deposition*, pp. 19-20.
Finally, Carpenter has not shown that Kaiser was required to abide by all aspects
of this document.  This evidence, therefore, is of no substantive value in
determining pretext.  *See Coulter v. Deloitte Consulting, L.L.C.*, 79 Fed. Appx.
864, 868 (6th Cir. 2003)("More to the point, Coulter has not presented any
evidence to show that Deloitte's own policies required it to reprimand or warn her
prior to firing her.  In fact, the record demonstrates just the opposite; Gromley has
identified and discussed certain performance deficiencies with Coulter prior to her
termination.").

### 2.  Retaliation for Reporting Gender Discrimination (Ninth Count for Relief)[15]

For the reasons just discussed, Carpenter's claim of wrongful discharge in retaliation for reporting gender discrimination has even less bite than his claim of wrongful discharge in retaliation for taking a medical leave of absence.  Again, Carpenter relies primarily on a (coincidentally) close temporal proximity to establish a causal connection between his discharge and his reporting of alleged gender discrimination.  Under the authority previously cited, however, the Court finds that this "proximity in time" is insufficient as a matter of law to establish a prima facie case of retaliatory discharge for reporting gender discrimination.

The mere fact that one event followed another is not sufficient to make out a causal link.  Where adverse action is taken against a satisfactorily performing employee in the immediate aftermath of the employer becoming aware of the employee's protected activity, an inference of causation may be possible.  Where, however, adverse employment actions or other problems with an employee predate any knowledge that the employee has engaged in protected activity, it is not permissible to draw the inference that subsequent adverse actions, taken after the employer acquires such knowledge, are motivated by retaliation.  *See Skrjanc v. Great Lakes Power Serv. Co.*, 272 F.3d 309, 315 (6th Cir. 2001); *Zakharevskaia v. Online Computer Library Ctr.*, 2006 WL 1401666 (S.D. Ohio May 22, 2006); *Coulter v. Deloitte Consulting, L.L.C.*, 79 Fed. Appx. 864 (6th Cir. 2003).

---

[15]     While the Court is entertaining Carpenter's gender-based retaliation claim, the Court previously concluded that the *underlying* unlawful gender discrimination claim was insufficient to even survive a Motion to Dismiss and, therefore, was terminated by a prior Order of this Court.  While it is debatable whether Carpenter ever had a "good faith basis" to assert a gender discrimination claim in the first instance, and, thus, whether he can legitimately assert a gender retaliation claim in light of the case law discussed earlier, the Court does not reach this issue because it finds his retaliation claim meritless for other reasons.

More importantly, there is no evidence that the ***decision makers*** - Ms. King and Ms. Fekete - were aware of Carpenter's single complaint of sex discrimination.  The complaint was made the Friday afternoon before Carpenter returned to work on Monday morning.  The discussion occurred in a closed door meeting between Mort Stein and Carpenter.  Mr. Stein specifically said he would honor Carpenter's request to keep Carpenter's complaint quiet.  *Plaintiff's Deposition, p. 112*.  Carpenter himself testified he did not tell anyone he was disputing alleged discriminatory practices.  *Plaintiff's Deposition, p. 136*.

There is simply no basis in the record to believe that Ms. King and Ms. Fekete were somehow in contact with Mr. Stein over the weekend to discuss the meeting between Carpenter and Mr. Stein. Even if the Court were inclined to find that a single complaint of gender discrimination made one day before an employee with pre-existing performance problems was terminated is sufficient to establish a causal connection - which the Court need not address here - there simply is no evidence of a pretextual motive on the part of Ms. King and Ms. Feteke.

Kaiser has offered evidence that Carpenter was, in Ms. King's mind, an unsatisfactory employee well before he complained about gender discrimination.  There is adequate evidence that Kaiser had legitimate, non-discriminatory reasons to discharge Carpenter, that these reasons were based in fact, and that these reasons were the result of the culmination of several months of performance problems. While in other circumstances the temporal relationship between complaints of gender discrimination and a termination might support an inference of retaliatory motive, that is not the case here.

Carpenter testified he "could feel the heat and pressure turned up in the past few months" and that he was "being aggressively monitored." *Plaintiff's Deposition, p. 130*. Carpenter believed this was part of an effort "to set up [his] termination." *Id.*  As Kaiser points out, if it had been "plotting"

38

Carpenter's termination months prior to implementing it - as Carpenter apparently believes - then Carpenter's termination could not have been in retaliation for reporting gender discrimination (or, for that matter, taking a leave of absence).  Summary judgment, therefore, is appropriate on Carpenter's claim of retaliation for reporting gender discrimination (Ninth Count for Relief).

IV.    CONCLUSION

In light of the foregoing, it is

ORDERED THAT Kaiser's Motion for Summary Judgment (Doc. No. 35) is **GRANTED**.

**IT IS SO ORDERED.**

**s/Kathleen M. O'Malley**
**KATHLEEN McDONALD O'MALLEY**
**UNITED STATES DISTRICT JUDGE**

**Dated: September 27, 2006**